**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PARKER C., through his Parents | : | |
| TODD and CRYSTAL C., | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | No. 16-4836 |
| v. | : | |
| | : | |
| WEST CHESTER AREA | : | |
| SCHOOL DISTRICT | : | |
| | : | |
| Defendant. | : | |

**July  6, 2017**                                                         **Anita B. Brody, J.**

<u>**Memorandum**</u>

Parker C. and his parents, Todd C. and Crystal C. ("the Family") bring this action against the West Chester Area School District ("the District"). The Family alleges that the District failed to afford Parker a meaningful educational benefit, and therefore failed to provide Parker with a free appropriate public education ("FAPE") in violation of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, and § 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794.[1] The Family seeks a compensatory education for Parker's third, fourth and fifth grade years, as well as reimbursement for an independent educational evaluation ("IEE") they arranged. At a due process hearing that took place last year, Due Process Hearing Officer Dr. Linda Valentini ("Hearing Officer") concluded that Parker had not been denied a FAPE and

---

[1]      The IDEA requires states receiving federal funding to provide a FAPE to all disabled children residing within the state.  20 U.S.C. § 1412(a)(1).  Section 504 of the RA prohibits discrimination on the basis of disability in federally funded programs.  29 U.S.C. § 794(a).   "[W]hen a state fails to provide a disabled child with a free and appropriate public education, it violates the IDEA.  However, it also violates the RA because it is denying a disabled child a guaranteed education merely because of the child's disability."  *Andrew M. v. Del. Cty. Office of Mental Health & Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007).

therefore declined to award a compensatory education or reimbursement to the Family. The Family now challenges that decision.

Before me are the parties' cross motions for judgment on the administrative record. I exercise jurisdiction to review the Hearing Officer's decision under 20 U.S.C. § 1415(i)(2). Because I find that the Hearing Officer's conclusion that Parker was not denied a FAPE is not clear error, and for the reasons explained below, I will grant the District's motion and deny the Family's motion.

## I.    BACKGROUND

### a. *Early Medical History*

Parker C. is a quintuplet, born weighing 1 pound 12 ounces after only 26 weeks' gestation. Due Process Hearing Decision, Findings of Fact ¶ 1, June 10, 2016 ("F.F."). He suffered severe medical complications at birth, including an intraventricular hemorrhage and associated hydrocephalus, requiring a nearly year-long stay in the neonatal intensive care unit. *Id*. He was the last of his siblings to leave the hospital. *Id*.

Parker's early medical complications had an extensive impact on the right side of his brain, leading to significant physical and mental impairments. Tr. Due Process H'rg, 545:11-18 ("N.T."). His medical history has impacted his physical, social, behavioral, and neurocognitive development. Compared to his siblings and the general population, Parker was very late to achieve early language and motor milestones and continues to struggle with developmental difficulties like lack of motor coordination. Neuropsychological Evaluation of Dr. Kara S. Schmidt, July 5, 2015, S-50 at 3-4, ("Schmidt Report").[1] He suffers from visual impairment and auditory processing delays. *Id*. at 5. Cognitively, Parker faces challenges in attention,

---

[1]       Record citations conform to the exhibits as entered during the Due Process Hearing. "S" denotes a School District Exhibit, and "P" denotes a Parent exhibit. Page numbers conform to the pages as stamped in the Administrative Record, ECF No. 3, not the original pagination of the documents.

organizational skills, memory, and executive functioning, which includes deficits in initiating

tasks, planning, and using past experience to guide future behavior.  F.F. ¶ 15. *See also*

Evaluation of Marianne Glanzmann, M.D., Children's Hospital of Philadelphia, June 12, 2013,

S-18 at 4.  As a second grader, Parker showed "less developed performance with tasks requiring

higher level attention and executive functioning skills." Neuropsychological Evaluation of Dr.

Karen Kelly, May 13, 2013, S-14 at 16, ("Kelly Report").  At the time, the impact of these

deficits was expected to "dramatically change each year, where the expectation[s] . . . increase."

*Id* . These deficits place Parker at "great risk for increasing academic and social problems." S-18

at 4.

Despite his hurdles, Parker's disposition is unreservedly praised by everyone who meets

him: he is described as sweet, persistent, hardworking, affectionate, and all-around well-liked,

with a good sense of humor. Schmidt Report at 2; F.F. ¶ 29; Testimony of Nina Yost, N.T.

588:6-9; S-32 at 8. Parker "is doing remarkably well regarding his . . . medical history and

neurological history." N.T. 553:17-20

b.  *Early Educational History*

Parker was first identified as eligible for special education in Tennessee. N.T. 24. In

2011, the Family moved to Pennsylvania immediately before Parker was to begin first grade.

F.F. ¶ 6. On November 14, 2011, The District evaluated Parker, and found him eligible under the

IDEA as a special education student with visual impairment. Evaluation Report, November 14,

2011, S-7 ("2011 ER"). Parker was later deemed eligible as a student with Other Health

Impairment ("OHI"). Although placed in the regular education classroom, Parker began to

receive vision support and occupational therapy from the District beginning in 2011. N.T. 25. He

received these supports, as well as regular education reading support, into his second grade year.

F.F. ¶ 9.

At the time of the 2011 ER, the District also administered a variety of cognitive tests to Parker. On the Wechsler Intelligence Scale for Children Fourth Edition (WISC-IV), Parker scored in the Low Average range. F.F. ¶ 6; 2011 ER at 5.[2] He scored in the Average range on the General Ability Index. On the Woodcock-Johnson Tests of Achievement Third Edition (WJ-III), Parker scored broadly in the Average to High Average range on a variety of subcategories. F.F. ¶ 7; 2011 ER at 7.[3]

In November 2012, pursuant to the IDEA, an Individualized Education Program ("IEP") was formulated for Parker's second grade year. F.F. ¶ 20. This IEP was revised throughout second grade and updated six times. *Id.*[4]

In the spring of 2013, near the end of Parker's second grade year, the Family raised concerns that Parker was struggling in school and needed additional supports. The Family requested and the District agreed to fund a private independent evaluation. F.F. ¶ 10. On May 17, 2013, Karen Kelly, Ph.D., conducted an evaluation of Parker. This report was considered an Independent Education Evaluation ("IEE") for the purposes of the IDEA. Kelly Report 1. On the Woodcock-Johnson Test of Cognitive Abilities Third Edition, Parker obtained a General Intellectual Ability score of 93 (32nd percentile), revealing cognitive skills in the Average range. Kelly Report 28. On the WJ-III, Parker scores were again mixed within the Average to High Average range. F.F. ¶ 11; Kelly Report 26.[5] Dr. Kelly diagnosed Parker with a Special Learning

---

[2]     Parker's numeric scores on the WISC-IV in 2011 were as follows: Full Scale IQ, 88 (Low Average); General Ability Index, 96 (Average); Verbal Comprehension, 89 (Low Average); Perceptual Reasoning, 104 (Average); Working Memory, 88 (Low Average); Processing Speed, 80 (Low Average).

[3]     Parker's numeric scores on the WJ-III in 2011 were as follows: Letter-Word ID, 112 (High Average); Passage Comprehension, 110 (High Average); Spelling, 114 (High Average); Writing, 110 (High Average); Math, 97 (Average); Applied Problems, 117 (High Average).

[4]     The specifics of this IEP are not outlined in detail because it falls outside of the period in which the Family claims Parker was denied a FAPE, 2013-present.

[5]     Parker's numeric scores on the WJ-III in 2013 were as follows: Letter-Word ID, 109 (Average); Passage

Disability ("SLD"), as well as a cognitive disorder. Kelly Report 18. Overall, the report indicated

that Parker's "intellectual functioning was in the lower end of the average range, with average . .

. achievement testing." Kelly Report 16. "This is notable," the report reads, "given [Parker's]

risk status as a youngster who falls into a category of children that have typically fared less well

on such measures." *Id*.

     *c.  Parker's Third Grade Year, 2013-2014*

     The IEP for Parker's third grade year was developed on September 25, 2013. F.F. ¶ 20.

Over the course of that year, his IEP was revised at least four times. N.T. 20:10-23. It contained

forty-one discrete services and individualized supports to be implemented throughout the year,

both in the regular classroom and in special education settings. S-27 at 34-40. The District also

reevaluated Parker, issuing a Reevaluation Report on November 11, 2013. S-25 ("2013 RR").

Pursuant to IDEA regulations, 34 C.F.R. § 300.305(a)(1), the 2013 RR contained a review of

existing evaluation data, classroom observations, input from parents, teachers, and therapists, as

well as reading assessments and skills ratings. 2013 RR at 3-34. This report recommended that

Parker's physical, occupational, and speech therapy continue, and also recommended Parker

receive Special Disability Instruction ("SDI") in the areas of processing speed, inferential skills

and scaffolding of instruction. F.F. ¶ 22. The 2013 RR also identified Parker's primary disability

classification as Other Health Impairment ("OHI"). 2013 RR at 32; S-56 at 5.

     Parker's IEP was revised again on December 6, 2013. The needs identified included

processing speed, organization, reading comprehension, inferential thinking, concept formation,

sustained attention, vision services, higher level coordination, and dysfluency. F.F. ¶ 23; S-27 at

1. By the middle of third grade, although Parker was receiving language arts and reading

---

Comprehension, 91 (Average); Spelling, 120 (Superior); Writing, 117 (High Average); Math, 99 (Average); Applied
Problems, 99 (Average).

instruction in the regular education classroom, he was increasingly receiving services by learning support staff in pull-out sessions. F.F. ¶ 24. Parker also received reading specialist and social skills support from the guidance counselor. F.F. ¶¶ 26-30. His proportion of time outside the classroom increased from 22 percent to 31 percent over the course of the third grade year. N.T. 20:22-23.

Parker received generally satisfactory grades throughout his third grade year. S-49 at 9. He was described as a "hard-worker." *Id.* His IEP Progress Report notes that he had "improved on completing his work in a timelier manner," and that his "confidence . . . improved much" and his task completion had "slightly improved." S-32 at 8. But the report also notes that Parker often "forgets to implement certain strategies" and that he needed improvement in organizational skills and inferential thinking. *Id.* Parker's IEP team reconvened on February 4, 2014 to address the Family's concerns that Parker's grades were not reflective of his true academic ability. F.F. ¶ 33. The IEP was amended to reflect the Family's input but no substantive changes were made to the plan at that time. S-32 at 1-2.

On May 21, 2014, at the end of Parker's third grade year, Parker again received Woodcock-Johnson testing and his IEP was updated a fourth time. F.F. ¶¶ 40, 46. Parker's testing revealed that he remained in the broadly Average range, although he received fewer High Average range scores than the previous administration of the test. F.F. ¶¶ 46-47.[6] Reading fluency and math fluency goals were added to his IEP. F.F. ¶ 40.

---

[6] The Woodcock-Johnson Tests of Achievement was updated sometime between Parker's testing in 2013 and in 2014. F.F. ¶¶ 46-47. In 2015, Parker received the Woodcock-Johnson Tests of Achievement Fourth Edition. Schmidt Report 29. New categories of testing were added to the Fourth Edition, but for the purposes of comparison, only the categories for which consistent scores are available are presented. Parker's numeric scores on the updated WJ in 2014 in those areas were as follows: Letter-Word ID, 106 (Average); Passage Comprehension, 91 (Average); Spelling, 121 (Superior); Writing, 102 (Average); Math, 98 (Average); Applied Problems, 99 (Average).

*d. Parker's Fourth Grade Year, 2014-2015*

The IEP for Parker's fourth grade year was developed on September 14, 2014. F.F. ¶ 51. At the IEP meeting, the Family requested more help in the area of executive functioning. S-39 at 14. In addition to updating the goals of his prior IEP, Parker's fourth grade IEP included goals for reading comprehension, inferential and critical responses, reading fluency, math fact fluency, math concepts and applications, and task completion. F.F. ¶ 50. The IEP team determined there was not a need for direct instruction in social or study skills. F.F. ¶ 51. The IEP team modified Parker's IEP with respect to task prompting to set a goal of no more than two requests before a task is initiated, modifying the goal on account of the higher difficulty level of tasks in fourth grade. F.F. ¶ 63.

A substantial portion of Parker's school day continued to be devoted to individualized special education. He received pull-out instruction in reading, as well as push-in support in a co-teaching model for science and social studies. F.F. ¶ 52. He received regular consultation with a reading specialist. F.F. ¶ 53. Parker began the year receiving push-in instruction in math, but that model was updated to pull-out instruction in the learning support classroom so that the pace and content could better suit Parker's individualized needs. F.F. ¶ 54; N.T. 242-244. Parker also continued to receive pull-out services in occupational therapy, physical therapy, and speech and language therapy. F.F. ¶ 56. Parker's IEP incorporated twenty-eight discrete services and individualized supports to be implemented throughout the year. S-39 at 32-37. He also received instruction on task organization strategy. F.F. ¶ 64.

On March 23, 2015, Parker's IEP was revised to include recommendations from a functional behavioral assessment ("FBA") he received. New goals were set to reduce "off-task" behaviors, and a strategy of nonverbal prompting was incorporated into the IEP. F.F. ¶ 65.

Parker maintained satisfactory grades in fourth grade, although "modifications [were] made to the general 4th grade curriculum for him." S-49 at 12. The expectations of Parker were "different for him than what is expected of a neuro-typical child in 4th grade." *Id*. Nonetheless, the number of "Needs Improvement" grades in his Learning Related Behaviors assessment decreased from 3rd grade to 4th grade. *Id*. In physical education, Parker "improved from the start of the year," but "did not meet end of year proficiency" in game skills. S-49 at 14. The learning support specialist reported that Parker "definitely improved and progressed" in reading fluency. N.T. 370:25-371:2. Parker met both of his individualized goals in Speech and Language Therapy, S-56 at 9, and continued to progress in speech fluency. N.T. 583:5. His Occupational Therapy progress report showed that Parker "has met or exceeded the criteria for his occupational goals for all four reporting periods." S-56 at 8. He also met his social skills goals for initiating conversations. S-56 at 10.

The Family was not satisfied with Parker's progress through fourth grade, so at the end of that year the Family commissioned a second IEE. In July 2015, Parker was evaluated by Dr. Kara Schmidt. Dr. Schmidt met with Parker for "six or seven hours," plus one hour of classroom observation. N.T. 489:3-8; 490:17. In her report dated July 5, 2015, Dr. Schmidt noted the cognitive deficiencies Parker suffered on account of his early medical history, and pointed out particular weaknesses in executive functioning. Nonetheless, she reported that Parker's "intellectual skills were within the average range." N.T. 492:21-25. She noted that Parker's deficits were similar to those identified by Dr. Kelly in 2013. F.F. ¶ 74; Schmidt Report 3 ("[Kelly's] diagnostic impression was as follows: Cognitive disorder NOS (attention, organizational deficits, memory impairment, executive functioning weaknesses) . . .). She also administered the WJ-IV, and Parker received broadly Average range scores, although he

received more Low Average scores than he had previously received.[7] Dr. Schmidt also administered the WISC-IV, and Parker received solidly Average range scores. Compared to the WISC-IV assessment Parker had received in 2011, his numeric scores increased in every category.[8]

Dr. Schmidt diagnosed Parker with an SLD in reading, written expression, and mathematics, as well as a speech and language impairment. F.F. ¶ 78. She recommended that Parker receive direct instruction in reading, reading comprehension, executive functioning and social skills. F.F. ¶ 79.

On July 30, 2015, Parker's IEP team met with Dr. Schmidt to consider the results of her evaluation and incorporate her recommendations into Parker's IEP. The team added specially designed instruction to Parker's IEP, including additional organizational goals and social skills goals, but did not implement direct instruction in executive functioning. F.F ¶ 81; S-52.

*e. Parker's Fifth Grade Year, 2015-2016*

Parker's fifth grade IEP was created on September 16, 2015 and revised in December of that year. F.F. ¶ 86. In addition to the physical, speech, and vision therapy, Parker's IEP included the following: accommodations for slow processing speed, support with organization of materials and work space, direct instruction in inferential reading comprehension, direct instruction in math fact fluency and math concepts, and accommodation to assist with concept formation. F.F. ¶ 86; S-56. Parker also received social skills instruction from a special education teacher, which consisted of small group sessions and individualized support. F.F. ¶ 88. His IEP

---

[7] Parker's numeric scores on the WJ-IV in 2015 were as follows: Letter-Word ID, 93 (Average); Passage Comprehension, 83 (Low Average); Spelling, 111 (High Average); Writing, 92 (Average); Math, 99 (Average); Applied Problems, 92 (Average).

[8] Parker's numeric scores on the WISC-IV in 2015 were as follows: Full Scale IQ, 98 (Average); Verbal Comprehension, 98 (Average); Working Memory, 94 (Average); Processing Speed, 92 (Average); Visual Spatial, 92 (Average); Fluid Reasoning, 103 (Average).

set forth thirty-three individualized supports and services provided to him throughout the school day. S-56 at 32-39.

Parker's speech therapist reported progress in decreasing speech dysfluencies from November 2015 to January 2016. 2011 ER at 16; N.T. 598:1. Parker also continued to receive satisfactory grades during the first half of his fifth grade year. P-9 at 1. He received grades of 97 and 95 in Science for the first two marking periods of fifth grade, higher grades than he had ever received in the past three years. *Id*. The number of "Demonstrates Consistently" scores on his Learning Related Behaviors assessment, the highest mark, also increased from fourth grade to fifth grade. *Id.* Parker's fifth grade teacher noted his "strong work ethic." *Id*. In physical education, Parker's teacher wrote: "Parker's effort is noticeably improved this year. His skills are improving as a result. Keep it up! I am proud of him for his efforts." *Id*. at 3.

### f. *Procedural Background*

The Family continued to be dissatisfied with Parker's progress and felt that the revisions to his IEP were not fully addressing Parker's needs. On December 1, 2015, pursuant to the IDEA, the Family initiated a due process hearing based upon the District's alleged failure to provide Parker a FAPE. The Family sought compensation for this failure, as well as reimbursement for the Independent Educational Evaluation (IEE) conducted by Dr. Kara Schmidt. On June 10, 2016, following a multi-day hearing in which testimony was heard from nine witnesses, the presiding Special Education Hearing Officer Dr. Linda Valentini denied all relief to the Family.

On September 8, 2016, The Family filed a complaint in this Court claiming the Hearing Officer's decision is flawed. ECF No. 1. The Family seeks a reversal of the Hearing Officer's decision and an award of compensatory education from the period of December 2013 to the end

of Parker's fifth grade year in 2016. On December 5, 2016, The District moved for judgment on the administrative record. ECF No. 10. On December 15, 2016, The Family also moved for judgment on the administrative record. ECF No. 11.

## II.    LEGAL STANDARD

"When considering an appeal from a state administrative decision under the IDEA, district courts apply a nontraditional standard of review, sometimes referred to as 'modified de novo' review." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010). Under this standard, the district court must give "due weight" to the findings of the administrative hearing officer. *Id.* "Factual findings from the administrative proceedings are to be considered prima facie correct. If a reviewing court fails to adhere to them, it is obliged to explain why. The court is not, however, to substitute its own notions of sound educational policy for those of local school authorities." *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003) (citation omitted) (internal quotation marks omitted). *See also Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001, (2017).

"[C]laims for compensatory education and tuition reimbursement are subject to plenary review as conclusions of law. . . . [W]hether the District fulfilled its FAPE obligations—[is] subject to clear error review as [a] question[] of fact." *P.P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009)."Within the confines of these standards, a district court is authorized to make findings based on the preponderance of the evidence and grant the relief it deems appropriate . . . ." *D.S.* 602 F.3d at 564. "[T]he party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012).

A district court is to respect the credibility determination of the witnesses made by the

administrative hearing officer unless "nontestimonial evidence" requires a contrary conclusion. *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 200 (3d Cir. 2004). The district court is therefore to give "requisite deference" when the hearing officer affords more or less weight to the testimony of various experts based upon the nature of their expertise or the amount of time spent with the child. *Id. See also T.M. ex rel. T.M. v. Quakertown Cmty. Sch. Dist.*, No. 16-3915, 2017 WL 1406581, at *13 (E.D. Pa. Apr. 19, 2017).

## III.    DISCUSSION

### a.  The IDEA

The IDEA requires school districts to provide every disabled child with a "free appropriate public education." 20 U.S.C. § 1412(a)(1). Once a child is identified as having a disability under the IDEA, "school districts must work with parents to design an IEP [Individualized Education Program], which is a program of individualized instruction for each special education student." *Ridley*, 680 F.3d at 269.[9]  The IEP is "the primary mechanism for delivering a FAPE." *Id.* (internal quotation marks omitted). "The instruction offered must be 'specially designed' to meet a child's 'unique needs' . . . ." *Endrew F.*, 137 S. Ct. at 999 (emphasis omitted) (quoting 20 U.S.C. § 1401(29), (14)). The instruction must prepare the child for "further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A); *see also Ferren C. v. Sch. Dist.*, 612 F.3d 712, 717 (3d Cir. 2010).

---

[9] By statute, an IEP must contain:

| | |
|---|---|
| (I) | a statement of the child's present levels of academic achievement and functional performance . . . ; |
| (II) | a statement of measurable annual goals . . . ; |
| (III) | a description of how the child's progress toward meeting the annual goals described in subclause (II) will be measured . . . ; |
| (IV) | a statement of special education and related services and supplementary aids and services, . . . to be provided to the child . . ., and a statement of the program modifications or supports for school personnel that will be provided for the child . . . ; |
| (V) | an explanation of the extent, if any, to which the child will not participate with non-disabled children in the regular class. . . . |

20 U.S.C. § 1414(d)(1)(A)(i).

"The core of the IDEA is the collaborative process between the parents and the school officials to fashion the IEP." *Ridley*, 680 F.3d at 269 (citing *Schaffer v. Weast*, 546 U.S. 49, 53 (2005). An IEP is developed "only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *Endrew F.*, 137 S. Ct. at 999 (citing 20 U.S.C. § 1414(d)(1)(A)(i)(I)–(IV), (d)(3)(A)(i)–(iv)). In fashioning an IEP, "a school district is not required to provide a specific program or employ a specific methodology requested by the parent." *TM*, 2017 WL 1406581 at *3 (citing *Rowley*, 458 U.S. at 199). An "IEP need not aim for grade-level advancement" if such a goal "is not a reasonable prospect for a child." *Endrew F.*, 137 S. Ct. at 1000. "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Id*. at 1001.

A school district is not required to "maximize the potential of every handicapped child," but it must provide an education that confers a "meaningful benefit" to each child. *Ridley*, 680 F.3d at 268 (citation omitted). Although the demands of the IDEA are substantial, a school district is not required to provide the "best" possible education. *Polk v. Cent. Susquehanna Intermediate Unit 16*, 853 F.2d 171, 178 (3d Cir. 1988). "Nor is a school district required to provide each disabled child with opportunities substantially equal to those afforded to children without disabilities." *TM*, 2017 WL 1406581 at *3 (citing *Endrew F.*, 137 S. Ct. at 1001). Incremental progress can be meaningful, *Id*. at *13, but a meaningful benefit must be more than minimal. *Endrew F.*, 137 S. Ct. at 1001. An IEP must be "reasonably calculated to enable the child to make progress appropriate in light of [the child's] circumstances." *Id.* at 999.

   b.  *Parker C was not denied a FAPE.*

The Family makes three primary claims in asserting that Parker did not receive a meaningful educational benefit and was therefore denied a FAPE. First, the Family claims that

the Hearing Officer improperly applied a legal standard that was too low, and if Parker's record is viewed under the proper, heightened standard, it is clear he was denied a FAPE. Second, the Family claims that the District failed to provide Parker appropriate supports and instruction in executive functioning and social skills, and if these goals were identified, Parker nonetheless did not make progress with respect to them. Finally, the Family argues that the Hearing Officer erroneously found a meaningful educational benefit by relying solely on Parker's grades, which the Family claims were inflated, and ignored his skills regression in other areas.. Each of these arguments is considered in turn.

i.  The standard applied by the Hearing Officer.

The Family contends that Hearing Officer Valentini applied an incorrect legal standard for determining whether Parker was provided a FAPE. They argue that although Dr. Valentini cited the "meaningful educational benefit" standard that has long been the law in the Third Circuit, she nonetheless *applied* the "trivial or *de minimis* educational benefit standard" that had been the law in other Circuits. Pls.' Mem. Mot. J. Admin. R. 17-18, ECF No. 11 (citing *Polk*, 853 F.2d at 182). The District decries this claim as "preposterous," arguing that the Family cherry-picks Dr. Valentini's opinion and fails to consider it as a whole. Def.'s Opp. Mot. J. Admin. R. 5, ECF No. 14.

Resolution of this initial dispute is irrelevant, particularly in light of *Endrew F. v. Douglas County School District*, 137 S. Ct. 988 (2017). It is now indisputably the law nationwide that the proper standard for evaluating a student's progress in an IDEA case is "markedly more demanding than the merely more than *de minimis* test." *Id.* at 1000 (quotations omitted). Further, irrespective of which standard Dr. Valentini applied, under the modified *de novo* review required of this Court, I find that her ultimate conclusion was correct. *See* Parts B.i

and B.ii, *infra*. I am to accord "due weight" to the factual findings of Dr. Valentini, but do not accord the same weight to her standard of review. *See S.H.*, 336 F.3d at 271 (*"Even if the [initial decisionmaker] applied the wrong standard of review, we may still uphold its decision if correct under the appropriate standard of review."*) Therefore it is not necessary to ferret out exactly which legal standard Dr. Valentini utilized. Applying the "meaningful benefit" standard to the administrative record before me, for the reasons explained below, Parker was not denied a FAPE.

ii.  Parker's supports in executive functioning.

The Family contends that Parker was denied a FAPE because his IEPs in 3rd and 4th grade included no goals in the area of executive functioning, with the exception of task initiation and completion, and that he did not progress on those goals. Pls.' Mem. Mot. J. Admin. R. 23, ECF No. 11. Furthermore, the Family argues that "for any program to be appropriate there must be Direct Instruction" in executive functioning, and since Parker's IEP did not call for Direct Instruction, it fails. *Id*. at 25. The District responds that Parker's IEP addressed needs in processing speed, concept formation, task initiation, task persistence, and functional independence, and that the specially designed instructions for these deficits "were targeted at [Parker's] executive functioning needs." Def.'s Opp. Mot. J. Admin. R. 8, ECF No. 14.  The Hearing Officer did not evaluate the executive functioning goals for Parker on a per-IEP basis, but merely concluded that Parker "received group and direct instruction in executive functioning skills." Due Process Hearing Decision 14, June 10, 2016 ("DPH Decision"). The Hearing Officer also found that "special education cannot be expected to cure underlying neurological issues such as memory and processing speed." *Id.*

As outlined above, an IEP must take must be "reasonably calculated to enable the child to

make progress appropriate in light of [the child's] circumstances." *Endrew F.*, 137 S. Ct. at 1001. "[A] school district is not required to provide a specific program or employ a specific methodology requested by the parent." *TM*, 2017 WL 1406581 at *3 (citing *Rowley*, 458 U.S. at 199). The adequacy of an IEP turns on the "unique circumstances of the child for whom it was created." *Endrew F.*, 137 S. Ct. at 1001. An IEP is also not to be judged with the benefit of hindsight; the appropriateness of the IEP is judged as of the time it was developed. *D.S.*, 602 F.3d at 564–65.

"Executive functioning" is an educational term of art encompassing overlapping concepts. Dr. Kelly's 2013 evaluation defines executive functioning as follows:

> Executive functions are the operations that control and direct all behavior. Three basic areas of executive functions include working memory, inhibition and cognitive flexibility. . . . [F]orms of inhibitory control involve the ability to resist interference . . . In addition, components of attention overlap the area of executive functions, with attention often considered a subset of executive functioning capabilities.

Kelly Report 9. "Cognitive flexibility" is particularly important for tasks requiring "maintain[ing] a set of complex instructions," and task completion. *Id*. at 10. From Parker's earliest evaluations, his deficits in executive functioning were documented. *Id*. Dr. Kelly's report concluded Parker needed "some formal instruction on HOW to study" Kelly Report 20, and Dr. Schmidt concluded in 2015 that Parker needed "specialized instruction in study skills and general learning and memory strategies." Schmidt Report 23.

Contrary to the Family's assertions, it was not clear error for the Hearing Officer to find that Parker's IEPs contained goals and supports designed to address his needs in the broad area of executive functioning. Objectives in Parker's 2013 IEP included "beginning a given task independently within 30 seconds," and "remaining on task until task completion with no more than one prompt." S-27 at 6. As Parker was reevaluated and his IEPs were updated that year, needs were added for processing speed, inferential skills, and scaffolding of instruction, F.F. ¶

22, as well as organization, inferential thinking, concept formation, and sustained attention. F.F. ¶ 23.

In 2014, Parker's IEP similarly contained goals for task initiation, task completion and following directions. N.T. 217:24-218:2; ¶¶ F.F. 50, 63. He also received instruction on task organization strategy, F.F. ¶ 64, and a checklist system was implemented to help Parker with his unpacking and packing routines at the beginning and end of each day. N.T. 218:6-14. After his FBA evaluation, Parker's IEP team added goals to reduce "off-task" behaviors via a strategy of nonverbal prompting. F.F. ¶ 65. The Family acknowledges that Parker's fourth grade IEP revision contained "a certain level of executive functioning supports and accommodations." Pls.' Mem. Mot. J. Admin. R. 25, ECF No. 11. After Dr. Schmidt's evaluation in 2015, Parker's IEP team added additional organizational goals and social skills goals, but did not implement direct instruction in executive functioning. F.F ¶ 81; S-52. Later that year, Parker's fifth grade IEP included accommodations for slow processing speed, support with organization of materials and work space, and support for concept formation. F.F. ¶ 86; S-56. Parker also received direct social skills instruction from a special education teacher. F.F. ¶ 88; N.T. 277.

It was not erroneous for Hearing Officer to conclude that task initiation goals and memory and processing supports, which clearly aim at aiding "working memory, inhibition and cognitive flexibility," Kelly Report 9, were "targeted at [Parker's] executive functioning needs." Def.'s Opp. Mot. J. Admin. R. 8, ECF No. 14. Executive function is an expansive concept, involving cognitive functions that "control and direct all behavior." Kelly Report 9. For an elementary school child, goals in task initiation, completion and attention fall within the umbrella of "executive functioning." The District was also not required to employ direct instruction to address Parker's executive needs: a district is "not required to provide a specific

program or employ a specific methodology requested by the parent." *TM*, 2017 WL 1406581 at

*3. *See Rowley*, 458 U.S. at 199 (the IDEA does not require "the furnishing of every special

service necessary to maximize each handicapped child's potential."). *See also* 20 U.S.C. §

1414(b)(2)(B) (A district must "not use any single measure or assessment as the sole criterion for

determining . . . an appropriate educational program for the child.").

The Family also contends that to the extent Parker's IEPs contained executive

functioning goals in task initiation, "the progress monitoring on those task goals reveal minimal

progress at best." Pls.' Mem. Mot. J. Admin. R. 23 n. 7, ECF No. 11.  The record does show that

Parker's ability to successfully initiate tasks independently ranged from 94% in February 2013 to

77% in November 2013, and his ability to complete tasks with no more than one prompt ranged

from 96% to 77% in that same time period. *See* S-11 and S-27.

However, in the context of the full record, it was not clear error for the Hearing Officer to

determine Parker's executive skills did not regress. Task prompting goals were continually

reevaluated and updated based upon an individualized assessment of what was "realistic" for

Parker. N.T. 219:22. It was expected that Parker would face additional executive function

challenges as he progressed in school and the executive demands on him increased. Kelly Report

at 16. *See also* Testimony of Dr. Schmidt, N.T. 501:9-15 ("[A]s he is getting older, the demands

are going [] up . . . this demand has increased and it's become problematic for him."); N.T.

513:17-18. As Dr. Schmidt testified:

> In students like Parker, what we tend to see as you get older, our executive demands
> increase. So when he is in 1st grade, he has to do a lot of rote skills and learn a lot of
> mechanics. As he's gotten older, he has more demands on independent work and task
> initiation . . . So over time, it's not necessarily that this is specifically regressing in him,
> it's just that it's not developing at the rate with his peers because that's his weakness
> here. And the tasks when he is younger don't tap this as much . . .

> N.T. 496:18-497:5.

The IDEA requires an IEP "reasonably calculated" to engender "progress appropriate in light of [the child's] circumstances," *Endrew F.*, 137 S. Ct. at 1001, not "opportunities substantially equal to those afforded to children without disabilities." *TM*, 2017 WL 1406581 at *3 (citing *Endrew F.*, 137 S. Ct. at 1001). In light of this, and of Parker's demonstrated progress in other areas, see Part B.iii, *infra*, the Hearing Officer properly determined that Parker's IEP was satisfactory with respect to executive functioning.

iii.    Parker's academic progress

The Family claims it is "plain error" that the Hearing Officer determined that Parker received a FAPE based only upon his "mere ability . . . to obtain satisfactory grades." Pls.' Mem. Mot. J. Admin. R. 21, ECF No. 11. The Family has alleged repeatedly, in Parker's IEP meetings, at the due process hearing, and in their briefing, that "Parker's report card grades were not reflective of his true functioning." *Id*. at 28. The Family also claims that Parker regressed, pointing to his 2015 WISC-IV score. The District responds that the Family did not consider all of Parker's standardized achievement scores, and in the context of his full record it is clear he made adequate progress. Def.'s Opp. Mot. J. Admin. R. 12, ECF No. 14. The District also responds that Parker need not make "linear" progress, particularly when educational demands increase year-to-year, to be provided a meaningful educational benefit. *Id.* at 13.

"Whether a disabled child has benefitted is analyzed on a student-by-student basis." *E.D. ex rel. T.D. v. Colonial Sch. Dist.*, No. 09-4837, 2017 WL 1207919, at *11 (E.D. Pa. Mar. 31, 2017) (citing *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 248 (3d Cir. 1999)). In ascertaining whether academic progress has been sufficient to confer a meaningful education benefit, courts look to "regular examinations, grades, and advancing from grade to grade as important factors in measuring the educational benefit received by the disabled student." *Id.* (citing *Rowley*, 458 U.S.

at 201). Incremental progress can nonetheless be meaningful. *TM*, 2017 WL 1406581 at *13

("The underlying data, as we have noted, was reliable and demonstrated that T.M.'s incremental

progress was meaningful."). Grade-level advancement, although not required for all disabled

students when such a goal is not reasonable, *Endrew F.*, 137 S. Ct. at 1000, is a particularly

important factor when a special needs child is educated in the regular classroom. *Rowley*, 458

U.S. at 207 n. 28 ("When the handicapped child is being educated in the regular classrooms of a

public school system, the achievement of passing marks and advancement from grade to grade

will be one important factor in determining educational benefit.").

 *Parker's grades*. First, it is undisputed that Parker advanced successfully from third grade

to fifth grade, and received satisfactory grades. *See generally* S-49 and P-9. Courts may rely on

district progress reports and evaluations. *See T.M.*, 2017 WL 1406581, at *13 ("The hearing

officer properly relied on the district's progress reports and evaluations to track T.M.'s

progress."). The only dispute is whether Parker's grades were "reflective of his true functioning."

Pls.' Mem. Mot. J. Admin. R. 28, ECF No. 11. The Hearing Officer found that Parker's grades

were not inflated, F.F. ¶ 72, and there is ample evidence in the record to support that conclusion.

 The Family continually expressed that "the grades coming home were not an accurate

representation." 38:25-39:1. There is some evidence in the record that Parker's exam

administrations were modified, by giving him more time on tests, allowing him to retake tests, or

permitting him to answer fewer questions than other students. N.T. 453:1-17. Yet Parker's

teachers testified that in general, modifications to Parkers grades were not any different than any

other student. N.T. 233:21-22. His fifth grade teacher testified that his report card grades

represented much more than merely exam scores because "in rare occasions in 5th grade did

Parker have formal tests. Maybe once or two times this year we've had social studies quiz that I

offered modification for him." N.T. 457:11-20. Overall, Parker's teachers testified that his grades were reflective of Parker's performance, N.T. 458:15-16, and that his grades were therefore "[t]otally right in the mix with the rest of the students." N.T. 468:3-7

Assigning grades to students, particularly young children in grades three, four and five, is a holistic process. The Family does not meet their burden in showing that the Hearing Officer's factual finding that Parker's grades were not inflated was clear error. It was therefore not erroneous for the Hearing Officer to afford significant weight to Parker's grades and grade-level advancement in determining whether he received a meaningful educational benefit. *Rowley*, 458 U.S. at 207.

*Parker's achievement scores*. The Family also argues that Parker regressed academically, pointing primarily to his Woodcock-Johnson Achievement scores during Dr. Schmidt's evaluation which, at least numerically, show a moderate decline from 2011 to 2015. The record as a whole, however, presents ample evidence for the Hearing Officer to discount some of Dr. Schmidt's findings, and conclude that Parker's academic progress was meaningful and not a regression.

First, the Hearing Officer appeared to discount the later administrations of the Woodcock-Johnson Tests of Achievement (those given to Parker in 2014 and 2015) because the test had been updated, and therefore suffered from a phenomenon known as the Flynn Effect. F.F. ¶ 75.[10] The Flynn Effect is the principle that as a test is updated and renormed, "it's harder to achieve [the same] scores over time." N.T. 550:16-18 (testimony of Dr. Schmidt). As Dr. Schmidt acknowledged at the hearing, it is therefore difficult to compare scores from an earlier version of a test to a later version of a test, "and in this case . . . across a large span of time," the

---

[10]     Parker was administered the Third Edition of the Woodcock-Johnson in 2011 and 2013, but the Fourth Edition in 2014 and 2015.

effect can be pronounced. N.T. 551:3-4. Dr. Schmidt testified that "where [Parker] falls in comparison to his same-age peers . . . there is a decrease" in his numeric score, but "that is not the same as an actual regression of skills." N.T. 558:7-10.[11] Dr. Schmidt acknowledged that there is some "inconsisten[cy]" with regard to the data. N.T. 504:8-10. Given this testimony, it was not clear error for the Hearing Officer to contextualize Parker's WJ-IV scores.

Second, the Hearing Officer accorded less weight to Dr. Schmidt's 2015 administration of the WJ-IV because Parker exhibited "interfering behaviors during testing," and because Dr. Schmidt did not know Parker as well as the District's witnesses did. F.F. ¶¶ 77, 99. Dr. Schmidt testified that Parker was distracted during the examination, N.T. 523, and that his attention waned which had some influence on his performance. N.T. 527:1-4. Dr. Schmidt explained at the hearing that performance on cognitive achievement tests like the Woodcock-Johnson is situational and that scores are affected by environmental factors like the tester's rapport with the child. N.T. 548:1. Dr. Schmidt and Parker were not well-acquainted, and during her evaluation she met with Parker for only "six or seven hours." N.T. 489:3-8, 490:17. When reviewing Dr. Schmidt's written findings, Nina Yost, a speech and language pathologist who had worked with Parker for over three years at the time and has a very close relationship with him, remarked on

---

[11]     Dr. Schmidt did indeed testify that, in her opinion, "clearly in some areas [Parker's] reading fluency, this has gone down. In terms of his writing fluency, this has gone down." N.T. 504:1-2. However, it is not even clear that *regression* in some areas of academic achievement automatically means a meaningful educational benefit has not been achieved. Although the Third Circuit ruled in *Board of Education of East Windsor Regional School District v. Diamond* that the IDEA "requires a plan likely to produce progress, not regression or trivial educational advancement," this holding was later tempered. 808 F.2d 987, 991 (3d Cir. 1986). The court wrote two years later:
> [S]everely handicapped children (unlike normal children) have a strong tendency to regress. A program calculated to lead to non-regression might actually, in the case of severely handicapped children, impose a greater burden on the state than one that requires a program designed to lead to more than trivial progress. The educational progress of a handicapped child (whether in life skills or in a more sophisticated program) can be understood as a continuum where the point of regression versus progress is less relevant than the conferral of benefit. We note that it is therefore possible to construe *Diamond*'s holding not solely as an issue of progress or regression but also as requiring that any educational benefit be more than *de minimis*.
*Polk*, 853 F.2d at 184.

the behaviors Dr. Schmidt described. She testified: "It's funny because I feel like I know a completely different child than some of the things that were mentioned in this report." N.T. 588:6-9. The Hearing Officer was also entitled to give more weight to the testimony of the District's experts over Dr. Schmidt because they had spent far more time with him. *T.M.*, 2017 WL 1406581, at *13 ("Given the qualifications of the district's staff and the amount of time they spent with [the child], the hearing officer properly accorded more weight to their testimony than that of the parents' evaluator.").

There are also standardized testing scores measuring cognitive ability in the record that clearly evince progress. As explained above, Parker performed considerably better on the WISC-IV test in 2015 than he did in 2011. *Compare* note 2 and note 8, *supra*. In both numeric value and percentile score, Parker progressed from 2011 to 2015 in every category, scoring solidly in the "Average" range in 2015.

Finally, Dr. Schmidt testified that it was unsurprising that Parker's executive deficits, stemming from his troubling early medical history, would lead to lower test scores. Dr. Schmidt explained that executive functioning deficiencies engendered lower test scores in later years, but that those scores can be reflective of the increased demands of the test and the increased need for higher level processing skills, not a regression in underlying cognitive or academic achievement. N.T. 533. Therefore, "the comparison of standard scores over time [is] that much more challenging to make sense out of them if we are never quite sure how much those scores are a function of disexecutive function and how much they are of the underlying skill." N.T. 533:23-534:6. Taking all these factors into account, Dr. Schmidt testified that Parker was performing "remarkably well." N.T. 553.

The Hearing Officer appeared to place great weight on this statement by Dr. Schmidt,

that Parker "is doing remarkably well regarding his history and that type of student with that type of medical history and neurological history." N.T. 553:17-20. The parties spend considerable time debating the meaning of this testimony, derived from Dr. Schmidt's independent evaluation. Def.'s Br. Mot. J. Admin. R. 16, ECF No. 10; Pls.' Opp. Mot. J. Admin. R. 5, ECF No. 13; Schmidt Report 19. Dr. Schmidt indeed testified that she felt Parker was doing remarkably well considering the circumstances, even though she also identified areas of weakness in need of improvement. *Id.*; Schmidt Report 19. The Family claims this quote is taken out of context, and that Dr. Schmidt's overall report nonetheless reveals that Parker was not doing well educationally. Pls.' Opp. Mot. J. Admin. R. 5, ECF No. 13.

Although Dr. Schmidt qualified her statement in her report, and in her testimony, the Hearing Officer nonetheless found that she "completely agree[s] with the opinion of [Dr. Schmidt] that [Parker] is performing remarkably well given the nature and severity of his medical history." DPH Decision 17. This determination was not clear error. Viewing Dr. Schmidt's testimony and report in full context, The Family does not meet their burden, never mind present nontestimonial evidence, to discount the Hearing Officer's assessment of Dr. Schmidt's statement. The hearing contained ample evidence, much of it from Dr. Schmidt's own testimony, for the Hearing Officer to determine that Parker was performing well given the circumstances. Dr. Schmidt affirmed that conclusion at the hearing multiple times. N.T. 521:6-14; 545:11-18; 553:17-20. When asked if Parker could be expected to perform so "remarkably well" had he *not* been afforded a "reasonably appropriate [educational program], given his vulnerabilities," Dr. Schmidt replied, "No." N.T. 521:6-14.

Hearing Officer Valentini evaluated Dr. Schmidt's testimony, and her findings, in the context of the record and afforded it appropriate weight. Applying requisite deference to that

credibility determination, *Shore*, 381 F.3d at 200, I will not disturb it. There is also ample evidence in the record to demonstrate that Parker's academic progress was meaningful, and the Family fails to meet their burden in arguing otherwise. Parker was not denied a FAPE.

   c. *The District did not violate the ADA.*

   The Family asserts that the District's failure to provide Parker a meaningful educational benefit establishes that he has been unlawfully denied a FAPE in violation of Section 504 of the Rehabilitation Act as well as the Americans with Disabilities Act (ADA). However, "the remedies, procedures and rights" under the ADA are the same as those under Section 504, and therefore these two claims are equivalent. 42 U.S.C. § 12133. *See also Jeremy H. v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 279 (3d Cir. 1996).

   Because I find that the District did provide Parker a FAPE in accordance with IDEA, the Family's Section 504 and ADA claim must also fail. *See T.M.*, 2017 WL 1406581, at *14.

   d. *The Family is not entitled to reimbursement for Dr. Schmidt's IEE.*

   The Family also seeks a reimbursement for the evaluation conducted by Dr. Schmidt in 2015. The Family alleges that the 2013 Reevaluation Report, S-25, was inadequate, and therefore they are entitled to the evaluation by Dr. Schmidt at public expense. The Family claims that "[a]s a result of Dr. Schmidt's evaluation . . . goals related to fluency, social skills and direct instruction" were added to Parker's IEP for the first time. Pls.' Mem. Mot. J. Admin. R. 39, ECF No. 11. The District responds that the Family "never expressed disagreement" with the 2013 RR, and a threshold requirement of an IEE at public expense is that the family challenge the results of a district's evaluation. Def.'s Opp. Mot. J. Admin. R. 19, ECF No. 14. The District further argues that the 2013 RR was methodologically appropriate, and therefore no reimbursement is required. The Hearing Officer denied reimbursement because Dr. Schmidt's report "did not provide any new information." DPH Decision 17.

"A parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency." 34 C.F.R. § 300.502(b)(1). *See also Schaffer v. Weast*, 546 U.S. 49, 60 (2005). Once a parent expresses disagreement, a school district has two options: it may fund an independent evaluation or request a due process hearing to defend the appropriateness of its own evaluation. *Id.* A parent's "failure to express disagreement" with a district's evaluation prior to obtaining their own, however, "does not foreclose their right to reimbursement." *Warren G. ex rel. Tom G. v. Cumberland Cty. Sch. Dist.*, 190 F.3d 80, 87 (3d Cir. 1999). Reimbursement may nevertheless "be warranted where a parent does not take a position with respect to the district's evaluation or otherwise 'fails to express disagreement.'" *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 275 (3d Cir. 2007).

A parent may be reimbursed for an IEE "only by showing that the School District's [] re-evaluation [was] inappropriate." *Holmes v. Millcreek Twp. Sch. Dist.*, 205 F.3d 583, 591 (3d Cir. 2000). *See also Bd. of Educ. of Murphysboro Cmty. Unit Sch. Dist. No. 186 v. Illinois State Bd. of Educ.,* 41 F.3d 1162, 1169 (7th Cir. 1994). Federal law sets out clear requirements for an appropriate evaluation, including that a district "use a variety of assessment tools . . . [and] not use any single measure or assessment . . ." 20 U.S.C. § 1414(b)(2)(A). The evaluation must also be "administered by trained and knowledgeable personnel." 20 U.S.C. § 1414(b)(3)(A)(iv). In challenging an evaluation, courts have found that a parent "cannot simply argue that the evaluation was inappropriate because they disagree with its findings. The key is in the methodology. The conclusions, or lack thereof, cannot be inadequate unless the methodology is inadequate, because that is the only provision in the law." *L.S. ex rel. K.S. v. Abington Sch. Dist.*, No. 06-5172, 2007 WL 2851268, at *12 (E.D. Pa. Sept. 28, 2007).

It was erroneous for the Hearing Officer to deny reimbursement for the Schmidt Report solely because it did not "provide any new information." That is not the relevant standard. However, although the Family claims the 2013 RR was "cursory," they do not point to any specific methodological failures of the report that would render it inappropriate. Pls.' Mem. Mot. J. Admin. R. 38, ECF No. 11. The District was not required to re-administer formal cognitive testing that had just been completed six months earlier, in an IEE funded by the District. F.F. ¶ 21. *See* 20 U.S.C. § 1414(a)(2)(B) ("A reevaluation . . . shall occur-- (i) not more frequently than once a year."). The Family's claim that Dr. Schmidt's report was more "comprehensive and thorough" does not render the 2013 RR inappropriate. Pls.' Mem. Mot. J. Admin. R. 38, ECF No. 11. The Family is therefore not entitled to reimbursement for the Schmidt evaluation.

## IV. CONCLUSION

Parker's admirable progress, in light of his medical history, is a testament to the devotion and tireless advocacy of his family. For the reasons explained above, I find that the Hearing Officer's determination that Parker received a FAPE for the period of December 1, 2013 until the end of the 2016 school year was not clear error. The Family is also not entitled to reimbursement for Dr. Schmidt's 2015 evaluation. Therefore, the District's Motion for Judgment on the Administrative Record is granted, and the Family's motion is denied.

s/Anita B. Brody

_____
ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:          Copies **MAILED** on _____ to: